STANDARD PAINT CO. v. BIRD et al.

(Circuit Court, S. D. New York. January 24, 1910.)

1. PATENTS (§ 230*)—INFRINGEMENT—USE OF EQUIVALENTS.

To infringe a patent for a process of manufacture and its product, the alleged infringer must use the ingredients claimed to be those used in the process, or used to form the product, or a well-known equivalent therefor. It is not sufficient that tests or experiments have shown that some substance not claimed, and at the time the patent was applied for and granted not known, to be an equivalent, had proved just as good or just as efficient in the combination as a substitute for the ingredient claimed, and is used in its stead.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 367; Dec. Dig. § 230.*]

2. PATENTS (§§ 246, 247*)—INFRINGEMENT—PATENT FOR COMBINATION.

There may be an infringement of a combination patent by adding an element or an ingredient to obtain .the same result, or substantially the same, but not by leaving out an ingredient or an element of the combination, and not substituting an equivalent.

[Ed. Note.—For other cases, see Patents, Cent. Dig. §§ 387, 388; Dec. Dig. §§ 246, 247.*]

3. PATENTS (§ 328*)—VALIDITY AND INFRINGEMENT—COLORED ROOFING.

The Rugen and Abraham patents, No. 775,635 and No. 775,636, the latter being for an improvement on the former, and both for a process of making a flexible roofing or flooring and the resulting product, have for their object the production of a flexible weather-proof roofing in colors other than black, which is attained, as described and claimed therein, by pressing, hot, upon and into a foundation of paper, felt, etc., a colored facing consisting of a pigment and a mixture of a resinous body and a fatty body. Held, that such patents are not void for anticipation, nor indefiniteness or uncertainty of description, and in view of the superiority of the product as respects durable colors other than black, or very dark, over anything in the prior art, disclose patentable invention. Such patents also held infringed by a roofing in which the facing, applied in the same manner, consists of a pigment mixed with stearin pitch, which is, in itself, both a resinous and a fatty body.

4. PATENTS (§ 118*)—VALIDITY—SUFFICIENCY OF DESCRIPTION.

It is enough that a patent so fully describes a process or a product that one reasonably skilled in the art may practice the process or manufacture

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the product, and that others may know with reasonable certainty whether or not they are infringing it.

[Ed. Note.—For other cases, see Patents, Cent. Dig. § 170½; Dec. Dig. § 118.*]

**5. WORDS AND PHRASES—"STEARIC ACID."**

"Stearic acid," sometimes called stearin, is the solid constituent of fatty substances, as of tallow and olive oil, converted into a crystalline mass by saponification with alkaline matter, and abstraction of the alkali by an acid.

[Ed. Note.—For other definitions, see Words and Phrases, vol. 7, pp. 6655, 6656.]

In Equity. Suit by the Standard Paint Company against William B. Bird, Charles T. Carruth, and Reginald W. Bird, partners as J. A. & W. Bird & Co. On final hearing. Decree for complainant.

Suit to restrain alleged infringement of the eight claims of United States letters patent No. 775,635, dated November 22, 1904, to Louis C. Rugen and Herbert Abraham, assignors to the Standard Paint Company, for flexible roofing or flooring, and also to restrain alleged infringement of claims 4, 9, and 11 of United States letters patent No. 775,636, dated November 22, 1904, to said Rugen and Abraham, assignors to said Standard Paint Company, for weather-proof covering.

Kenyon & Kenyon (Alan D. Kenyon, of counsel), for complainant.
Samuel T. Carter (Marcus B. May and William Quinby, of counsel), for defendants.

RAY, District Judge. Both patents in suit relate to flexible weather-proof prepared roofings, while they may relate to flexible weather-proof prepared floorings, if desired.

The complainant's roofing, made under the patents in suit, is generally known as "Colored Ruberoid." Its main use is in place of shingles, slate, tin, etc., on roofs. The leading objects of these patents were to produce flexible weather-proof roofings in colors other than black. The flexible water-proof and weather-proof roofings of the prior art were black, or of a brownish black, unless painted. The flexible roofings made according to the claims of these patents are not painted to give them color, but the coloring matter is contained in and carried by the material forming what is known as the facing of the foundation. So carried in and forming a part of the facing of the roofing, the color is as durable and permanent as the facing itself, and does not crack or peel off or wear away, leaving the facing and foundation of black or brownish black, as does paint.

The roofing of the defendants alleged to infringe is known as "Zo-lium." I think the evidence establishes that the first successful colored roofing upon the market was this Colored Ruberoid, made in accordance with the claims of the patents in suit. They are popular, and have an extensive and increasing sale. They are pleasing and attractive in appearance to those who desire a colored roof and who use a roofing of this character. It is shown that these roofings are durable and serviceable, and that the coloring is permanent.

In a flexible water-proof and weather-proof roofing it is necessary to use for a foundation, at least, some suitable material, such as heavy paper, felt, cloth, or burlap, which must be saturated with a water-proof compound containing hydrocarbon material, or such foundation must be coated with such a compound. In the prior art the persistence and intensity of the black of the hydrocarbon or similar impregnating or coating materials was sure to drown the coloring material, other than black, put into the mixture, and as a result he who would have a colored roof of this character must resort to painting the weather-proof foundation, or the facing in case a facing was added to the foundation. There were other difficulties to be overcome, such as the cracking, peeling, and disintegration of the colored surface, and it was necessary to avoid a sticky surface, which would cause the folds of the rolls to adhere to each other when the material was on the market. The evidence shows that much time and money were expended in making tests and experiments to perfect the invention claimed.

The first patent mentioned, No. 775,635, contains six process claims and two claims for the product as a new article of manufacture. Claim 1 covers the herein described process of manufacturing a flexible material which consists (1) in impregnating a suitable fabric with a hydrocarbon mixture, and (2) then applying to the foundation thus formed, and (3) while the hydrocarbon mixture is soft and plastic, (4) a colored facing consisting (5) of a pigment and (6) a mixture of a resinous body, with (7) a fatty body; (8) the said facing being applied in a heated, plastic condition, so as to cause said coating to interlock with the foundation. Claim 7 calls for, as a new article of manufacture, (1) a flexible material; (2) said material comprising three portions, viz., (a) a foundation containing a hydrocarbon; (b) a facing containing a resinous body and a fatty body; and (c) an intermediate portion formed by the interlocking of the foundation and the facing. Claim 8 calls for, as a new article of manufacture, (1) a flexible material, having (2) a foundation with a hydrocarbon ingredient, and (3) a facing containing a resinous body and a fatty body; and (4) said facing and foundation being so interlocked that the hydrocarbon of the foundation and the two ingredients of the facing, viz., the resinous body and the fatty body, are all three present in (5) an intermediate portion.

Turning to the specifications, we find the following:

"In order to produce such a carrier or flux, we have made use of one or more of the class of bodies known chemically as 'resins,' and have combined them with waxes, fats, or oils."

Immediately before that the patent says:

"The carrier for the pigment consists of a substance or mixture which shall be to a greater or less extent weather-proof or resistant to oxidation, and which shall be flexible and, moreover, transparent, translucent, or at least light-colored, so that its own color may be modified or entirely obliterated by the addition of a pigment. Of course, another requisite of this carrier or flux, as it might be called, is that it should not injuriously affect the foundation, nor be itself injuriously affected thereby."

In another part of the specifications the patent says:

"We have referred to the ingredients of the carrier or flux as being a 'resin' or a mixture of resins, on one hand, and 'fats, oils, waxes,' or a mixture of them, on the other hand."

Each and every one of the claims of the patent uses the words "resinous body." It is claimed by the defendants that these claims are limited and restricted to what are known and recognized as chemical resins. In another part of the specifications it is said:

"The procedure in manufacturing the improved fabric is as follows: The foundation is prepared in any approved manner. The carrier or flux is then prepared by mixing and fusing together the oil, fat, or wax, or mixtures of oils, fats, and waxes, with resin or mixtures of resins."

The hydrocarbon foundation is old. The facing of such a foundation, formed or composed of a carrier containing a resinous body and a fatty body, was also old, and the combination or interlocking of the foundation with such a facing by heat was old. The problem was to introduce into the facing, composed of the resinous body and the fatty body, a pigment, or coloring matter, other than black, which should be carried in, not on, and retained by, the facing, and be of sufficient strength of color to overcome and drown the black of the hydrocarbon foundation, instead of being drowned by it, either by the interaction of the two or otherwise. The specifications say:

"Our invention relates to coverings of a flexible nature, such as are used principally for roofing and flooring. It has been found that, while such coverings can be made to fulfill all requirements of use, the production of ornamental effects is very difficult or practically impossible, since the incorporation of various pigments has so far proved just as unsatisfactory as the application of paints or varnishes to the water-proof roofing of the present construction. In all such cases the attempt has failed, either because the foundation has been injuriously affected by the vehicle of the pigment or other material, or because the colored coating could not be maintained flexible or permanent. Our present invention successfully overcomes these difficulties, by combining with the foundation a carrier or binder and a pigment so constituted and applied that they not only are thoroughly united with the foundation, so as to prevent cracking and peeling off; but, further, all injurious interaction between the constituents of the foundation and those of the pigment and its carrier is avoided."

Also, after describing what "we have made use of," the specifications say:

"By the use of these two combined ingredients—that is, a resin, on one hand, and a wax, fat, or oil, on the other hand—we produce a carrier or flux which in a molten condition receives pigments of various characters remarkably well, which is resistant yet flexible, which, when applied to a foundation of the character hereinbefore described, will have no injurious effect thereon, nor itself deteriorate, and which, moreover, can be made to adhere permanently and strongly to the said foundation."

The specifications also, as quoted, speak of "a mixture of resins," on the one hand, and fats, oils, waxes, or mixtures of them, on the other hand, as the ingredients of the carrier, and which, when combined or mixed with the pigment, form the "facing." This facing is made by "mixing and fusing together the oil, fat, or wax," or mixtures thereof, "with resins or mixtures of resins." This mass is heated to about a certain point, and "when thoroughly mixed and free from

lumps and strings the temperature is permitted to fall somewhat, when, if the immediate addition of the pigment is desired, the pigment is stirred in, and the stirring continued until the mass thickens in order to prevent the pigment from settling.

It is self-evident that a "resin," as generally understood, is to be employed, or a "mixture of resins," or a body or substance partaking of the properties of resins. The fact that the inventors had used chemical resins in making the mixture does not limit the claims to "chemical resins." The term used in the claim is "a resinous body," and the words necessarily mean something containing resins, or partaking of the properties of resins, as generally understood, there being nothing in the claims indicating that "chemical resins" are intended or necessary to the compound, or that resins not known as "chemical resins," or bodies partaking of the properties of resins, are inadequate or insufficient for the purpose desired or to be attained. Nor do the specifications state or indicate that a chemical resin is essential to the process or the product.

The defendants' Zolium, alleged to infringe, has the hydrocarbon foundation, and a facing compound of a pigment and stearin pitch mixed, the stearin pitch containing or carrying the pigment, and this facing and the foundation are combined, attached together when in a heated condition, so that they intermingle or interlock at the surfaces where they come together and form the intermediate portion, containing a part of the hydrocarbon foundation and a part of the stearin pitch, which is said to be and claimed to be a fatty body and also a resinous body, mixed with the pigment. The contention is that "stearin pitch" is not only a "fatty body," but a "resinous body," within the meaning of the claims of the patent in suit, and that the defendants infringe by using it in the combination. The defendants claim that stearin pitch is not a resinous body; that it contains no resin whatever.

If stearin pitch, used by the defendants, is not a "resinous body"— that is, one "partaking of the properties of resin"—there can be no infringement of patent No. 775,635, as I do not think that at the time of the filing of the application for the patent, or at the time of its issue, it was a well-known equivalent for resin, or a mixture of resins. The patent speaks of chemical resins as having been used in the process and production of the product, but repeatedly describes the process as using, and the product as containing, a "resin" or "resins," and then claims a "resinous body"; that is, one "like resin," or "pertaining to resin," or "partaking of the properties of resin." To infringe a patent of this description, the alleged infringer must use the ingredients claimed to be those used in the process, or used to form the product, or a "well-known" equivalent therefor. It is not sufficient that tests or experiments have shown that some substance not claimed, and, at the time the patent was applied for and granted, not known, to be an equivalent, had proved just as good or just as efficient in the combination as a substitute for the ingredient claimed. Gill v. Wells, 22 Wall. 1, 22 L. Ed. 699; Seymour v. Osborne, 11 Wall. 555, 20 L. Ed. 33; Brown v. Stillwell, 57 Fed. 731, 6 C. C. A. 528; Rowell v. Lindsay, 113 U. S. 97, 5 Sup. Ct. 507, 28 L. Ed. 906.

So there may be infringement by simply adding an element or an ingredient to obtain the same result, or substantially the same result, but not by leaving out an ingredient or an element of the combination, and not substituting an equivalent. The former may be an improvement, and the improvement may be patentable as such; but the latter does not contain or embrace all the elements of the patented combination. Brown v. Davis, 116 U. S. 237, 6 Sup. Ct. 379, 29 L. Ed. 659; Case v. Brown, 69 U. S. 320, 17 L. Ed. 817; Clerk v. Tannage, 84 Fed. 643, 28 C. C. A. 501.

Here the patented combination embraces, as an essential element thereof, "a resinous body," and also a wax, fat, or oil; and even if the stearin pitch contains the oil, or fat, or wax, and also an ingredient, or ingredients, which answer the same purpose as a resin or resinous body, its use does not infringe, unless it is shown that it is a "resinous body" or a well-known equivalent. I do not think that, to constitute a "resinous body," that body must necessarily have resin in its composition, or contain resin. It is a resinous body if it has the essential attributes of such a body; that is, if it "partakes of the properties of resin." It must partake of all the essential properties of resin—not necessarily those of all resins, but of resins generally, or of some resin. Ure's Dictionary says:

"Resins possess the following general properties: They are soluble in alcohol, insoluble in water, and melt by the application of heat, but do not volatilize without partial decomposition. They have rarely a crystalline structure, but, like gums, they seldom affect any peculiar form. They are almost all translucid, not often colorless, but generally brown, occasionally red or green. Any remarkable taste or smell, which they sometimes possess, may be ascribed to some foreign matter, commonly an essential oil. Their specific gravity varies from 0.92 to 1.2. Their consistence is also very variable. The greater part are hard, with a vitreous fracture, and so brittle as to be readily pulverized in the coal. Some of them are soft, a circumstance probably dependent upon the presence of a heterogeneous substance. The hard resins do not conduct electricity, and they become negatively electrical by friction. When heated, they melt more or less easily into a thick viscid liquid, and concrete, on cooling, into a smooth, shining mass, of a vitreous fracture, which occasionally flies off into pieces, like Prince Rupert's drops; especially after being quickly cooled, and scratched with a sharp point. They take fire by contact of an ignited body, and burn with a bright flame, and the diffusion of much sooty smoke. When distilled by themselves in close vessels, they afford carbonic acid and carbureted gases, empyreumatic oil of a less disagreeable smell than that emitted by other such oils, a little acidulous water, and a very little shining charcoal. See Eosin Gas.

"Resins are insoluble in water, but dissolve in considerable quantities in alcohol, both hot and cold. This solution reddens tincture of litmus, but not sirup of violets. It is decomposed by water, and a milkiness ensues, out of which the particles of the resin gradually agglomerate. In this state it contains water, so as to be soft, and easily kneaded between the fingers; but it becomes hard and brittle again when freed by fusion from the water. The resins dissolve in ether and the volatile oils, and, with the aid of heat, combine with the unctuous oils. They may be combined by fusion with sulphur, and with a little phosphorus. Chlorine water bleaches several colored resins, if they be diffused in a milky state through water. The carburet of sulphur dissolves them."

Resins, or a resinous body, should be soluble in alcohol, insoluble in water, and melt by the application of heat. They do not volatilize without partial decomposition. Some of them have a crystalline form

or structure. Generally, but not always, they are translucent, and generally are of a brown color. Their consistence is variable. When heated, they melt into a thick viscid liquid, and concrete on cooling into a smooth, shining mass. They take fire by contact with an ignited body. Resins dissolve in ether and the volatile oils. When heated, they combine with the unctuous oils. They combine readily with the alkalis and alkaline earths, and form what were once called soaps; but they are not truly saponified. They represent the acid constitution themselves, and, as such, saturate the salifiable bases. They are not conductors of electricity. The solid resins are amber, amine, benzoin, colophony, copal, dammara, dragon's blood, elemi, greaiac, lac, resin of julap, ladanum, mastic, sandarach, storax, and takamahoe. Ure's Dictionary.

Stearic acid, sometimes called stearin, is the solid constituent of fatty substances, as of tallow and olive oil, converted into a crystalline mass by saponification with alkaline matter and abstraction of the alkali by an acid. It is soluble in alcohol, but insoluble in water. It melts under the influence of heat. It burns like wax. At a boiling heat in water there is more or less decomposition. It is generally dark in color, ranging from black to nearly white. When heated they melt into a thick liquid, and, on cooling, concrete into a shining mass. See Ure's Dictionary, "Stearic Acid." Walker, defendants' witness, says the stearin pitches are not conductors of electricity. It would be wearisome to go into the details of the evidence of the experts. It is evident, I think, that stearin pitch, a product, has the main properties of the resins, the essential ones so far as this patent is concerned, and that it partakes "of the properties of resins."

"Pitch, of wood tar, is obtained by boiling tar in an open iron pot, or a still, till the volatile matters be driven off. Pitch contains pyroligneous resin, along with colophany; but its principal ingredient is the former, called by Berzelius pyretine," and, "Pitch, mineral, is the same as bitumen and asphalt." Ure's Dictionary.

"Bitumen, or asphaltum, a black substance found in the earth, externally not dissimilar to pit coal. It is composed of carbon, hydrogen, and oxygen, like organic bodies; but its origin is unknown." Ure's Dictionary.

"Organic: * * * Pertaining to a characteristic of an organ, or the organs of animals and plants. * * * Pertaining to objects that have organs; hence, pertaining to the animal and vegetable worlds; resulting from, or exhibiting characteristics peculiar to animal or vegetable life and structure. * * * Organic remains: Fossil remains of a plant or an animal." Century Dictionary.

Of bitumen or asphaltum, mineral pitches, Ure says:

"According to John, asphaltum may be decomposed by different solvents, into three distinct substances. Water dissolves nothing; alcohol (anhydrous) dissolves out a yellow resin equal to 5 per cent. of the weight of the asphaltum; that resin is soluble in dilute alcohol and in ether. The portion not soluble in the alcohol gives up a brown resin to ether, amounting to 70 per cent. of the weight of the asphaltum. On evaporating off the ether, the resin remains of a brownish-black color, which dissolves readily in the volatile oils, and in the oil of petroleum. The portion of asphaltum which does not dissolve in ether is very soluble in oil of turpentine, and in oil of petroleum; but less so in oil of lavender. These three resinous principles dissolve altogether by digestion in the oils of anise, rosemary, turpentine, olive, hemp-seed, nut, and linseed. * * *

"The origin of bitumen is as little known as that of most of the productions of nature. Some regard it as an empyreumatic oil, a matter analogous to liquid resin or essential oil, resulting from the destruction of that astonishing multitude of animals and vegetables buried in the earth, whose solid remains are daily brought to view in mineral researches. It has been also supposed that naphtha and petroleum are the product of coals, decomposed either by the fire of volcanoes, by the subterranean combustion of coal itself, or by the decomposition of pyrites. The latter opinion is not supported by any direct evidence, but the two former are sufficiently probable."

It appears in the evidence beyond all question that stearin pitch has been classed among the resins, gum resins, and balsams employed in the manufacture of varnishes. We have resinous or pitch-like constituents of mineral oils. Amber, one of the solid resins, is found to contain the remains of both vegetable and animal life. It is classed as a "mineral solid" (Ure's Dictionary), but, evidently, is the result of a combination of animal and vegetable matter, acted upon by certain pure minerals or mineral formations. Probably it is mostly of vegetable origin, and existed originally in a liquid form. This is not certain. Walker, defendants' expert, says:

"Stearin pitches contain many complexes, and, as I believe, yet unknown compounds, which in themselves must vary with the treatment to which each pitch has been subjected during its method of manufacture."

He also says:

"The commercial stearin pitches on the market include palm oil pitch, or, as it is frequently termed, 'German pitch,' cottonseed pitch, and the pitches obtained by treating the animal oils and fats for stearin, specific names for which I do not at this time recall. * * * The name 'stearin pitch' refers, however, to the product from the distillation to which oils and fats of whatever source are subjected in the manufacture of stearin, and the so-called varieties vary somewhat in the product of the different manufacturers."

While the second patent in suit, No. 775,636, was issued on the same day as the first, No. 775,635, it was applied for May 27, 1904, about three months after the filing of the application for the first patent. It is a carrying forward, extension, and perfection of the first patent, or patent first applied for. Its object is "to provide certain improvements in the manufacture of such coverings [roofs], whereby colored coverings may be readily produced." It says:

"The incorporation of pigments has presented great difficulties; but we succeeded at last in overcoming them, particularly in the manufacture of coverings containing bitumen and pitches showing a black color when examined in thin layers. There is, however, another class of bitumens and pitches which exhibit a brownish color when examined in thin layers."

It then refers to the fact that, when the pigment is mixed with these brown bitumens or pitches in a molten or plastic condition, they will assume or show the color of the pigment to a limited extent only, but that after a time, say in two months, the color of the pigment will gradually become visible and increase in distinctness until a maximum is reached. To put such a roofing, one not showing its true color, on the market, obviously, would be unwise, and hence an extra or superficial coating has been devised and applied of the color of the pigment contained in the carrier itself; but this is only temporary, and soon

washes off and disappears, leaving the roof of the color of the pigment used in the carrier of the facing.

In this (the second) patent we may have the same foundation as in the first, and a facing composed of brown pitch, or of brown bitumen, and of pigment thoroughly mixed. This facing is, or may be, united to the foundation in the manner described, or in "any approved manner," but preferably by applying the facing while the foundation is in a heated or plastic condition. It should be durably applied, and does not follow the other or first patent in this element or requirement. The brown pitch or bitumen is selected, for the reason the pigment will develop or show its true color through it and give its color to the roof, while those bitumens or pitches which are black in a thin layer conceal or drown the color of the pigment, and we still have a black roof, or, it may be, one varying somewhat from black, but still failing to exhibit the color of the pigment when mixed with the bitumen or pitch which forms the true facing or carrier for the pigment. It is obvious that a roofing formed of a foundation (such as has been described) and of a facing composed of bitumen or pitch, or of a fatty body and a resinous body mixed, such facing containing a pigment to give the desired color, should have the facing as flexible as the foundation and of the same degree of expansion under the influence of heat and cold, and also weather-proof. The foundation and facing, when brought together, must so interlock or unite, the one with the other, that they will not separate; that is, so that the facing will not peel from the foundation. As this patent aims at a colored roofing (one other than black), the pigment must be contained in and carried by the facing, and the material composing the facing must be one which will allow the pigment to exhibit through it to the open air its true color, and at the same time not take up the black of the hydrocarbon foundation, and thereby destroy, or affect, or modify, the color of the pigment. The patent does not attempt to fully explain why it is that, using these brown pitches or bitumens, the true color of the pigment gradually develops or shows on the open-air side, but says:

"As hereinbefore stated, the gradual development or appearance of the pigment may be explained as due to a partial destruction of the pitch or bitumen by oxidation, although other explanations might be advanced."

Claims 4, 9, and 11 of patent No. 775,636, only, are in issue, and these read:

"4. The herein-described process of producing weather-proof coverings, which consists in applying to a suitable foundation a facing containing a bitumen or pitch exhibiting a brownish color when viewed in a thin layer, said facing also containing a pigment adapted to become clearly visible or to develop upon exposure to the atmosphere. * * *

"9. As a new article of manufacture, a weather-proof material, the same comprising a foundation and a facing which comprises a pitch or bitumen of a brownish color when viewed in a thin layer and a pigment adapted to be developed by atmospheric influences. * * *

"11. As a new article of manufacture, a weather-proof material, the same comprising a foundation and a facing containing a pigment and a body consisting of a pitch or bitumen of a brownish color when viewed in a thin layer."

Claim 4 is for the process, which consists in applying (1) to a suitable foundation—any suitable foundation—(2) a facing containing (a)

a bitumen or pitch, which (b) exhibits a brownish color when viewed in a thin layer, said facing containing (3) a pigment adapted to become clearly visible, or to develop upon exposure to the atmosphere. This, at first, would seem to indicate that there are some pigments which develop their color or become visible in such color when exposed to the atmosphere only, and that therefore this latter clause relates solely to the selection and use of a certain kind or quality of pigment. Another construction is that "adapted" means pigment so placed in or combined with the bitumen or pitch that, when the facing containing the pigment is exposed to the atmosphere, the true color of the pigment will be drawn out, and show and give or impart its color to the roof. I do not understand the pigment itself is to be bodily exposed to the atmosphere.

Claim 9, for the product, demands a weather-proof material composed of (1) a foundation, (2) a facing therefor, comprising (a) a pitch or bitumen, which must be (b) of a brownish color when viewed in a thin layer, and (c) a pigment adapted to be developed by atmospheric influences.

Claim 11, for the product, demands a weather-proof material composed of (1) a foundation, and (2) a facing containing (a) a pigment and (b) a body consisting of a pitch or a bitumen of a brownish color when viewed in a thin layer. This claim makes no mention of "a pigment adapted to be developed by atmospheric influences." This claim, therefore, covers a "weather-proof material" having a weather-proof foundation—that is, a felt or cloth saturated with hydrocarbon, or any suitable foundation—and a weather-proof facing, containing a pigment, and which facing is composed of a pitch or a bitumen of a brownish color when viewed in a thin layer, whether the pigment shows its true color immediately, or at a future time with relation to the completion of the product. It may be that some pigments would show their color at once, or in a few hours, while others would not show their color under a few days or weeks.

It is contended by the defendants that both patents are void because of: (1) Anticipation or lack of novelty, in view of the prior art. (2) Insufficiency of description. (3) Indefiniteness of the specifications and claims. (4) Concealment of the whole truth relative to the alleged inventions. And, finally, the defendants say there is no infringement shown.

I fail to see any indefiniteness or uncertainty in the specifications and claims of the second patent. The prior art plainly taught that paper, or felt, or a like material, saturated with asphaltum, tar, or pitch, or both saturated and coated therewith, as the specifications state it may be, is weather-proof for a reasonable time. The specifications also assert that:

"The permanent facing consists of a carrier and a pigment. The carrier contains one or more pitches of the brownish kind hereinbefore mentioned."

That is, say the specifications:

"There is, however, another class of bitumens and pitches which exhibit a brownish color when examined in thin layers."

· The class or kind of pitches or bitumens is plainly designated. We have seen that some bitumens have one color and some another, and this the general literature on the subject disclosed. But the patent specifications, referring to the "brownish kind" continue:

· "Most pitches of animal and vegetable origin belong to this class; that is, those derived from fats and oils."

This clearly includes the stearin pitches.

"Some mineral pitches, as, for instance, Egyptian asphaltum, also have this characteristic."

The patent also points out that "a metallic oxid pigment is preferred," although other weather-proof pigments may be employed. The patent then points out how to produce a yellow roofing. Clearly, it was not necessary to describe the whole process of making roofing of all colors, or to name all the pitches or bitumens which exhibit a brownish color in thin layers, or to tell what was meant by a thin layer. It is enough that a patent so fully describes a process or a product that one reasonably skilled in the art may practice it or manufacture the product, and that others may know with reasonable certainty whether or not they are infringing the patent. Section 4888, Rev. St. (U. S. Comp. St. 1901, p. 3383); Adams v. Lindell, 77 Fed. 432, 23 C. C. A. 223; Keystone v. Phœnix, 95 U. S. 274, 24 L. Ed. 344. The patent must more than vaguely and indefinitely hint at an element. Western v. Ansonia, 114 U. S. 447, 5 Sup. Ct. 941, 29 L. Ed. 210; Lehigh Valley R. Co. v. Mellon, 104 U. S. 112, 26 L. Ed. 639. The patent must be so definite that on its expiration the world may have the benefit of it, or of the discovery or invention disclosed thereby.

This objection is specifically urged against the first patent, No. 775,-635. It is insisted that the patent is not sufficiently specific and definite to indicate the kind or quality of the impregnating material to be used for the foundation, or of the fatty body, or of the resinous body, or of the pigment, to be used in making the facing and carrier or either; that one attempting to carry out the alleged invention is left in doubt and compelled to resort to experiment, it might be in the whole field of impregnating material, of fatty bodies, of resinous bodies, and of pigments. The patent states that "three factors are to be considered, to wit, the flexible foundation, the pigment, and the pigment carrier"— that is, the fatty body and the resinous body. Paper, felt, cloth, burlap, etc., are specifically mentioned. This, whichever is used, is to be saturated with a water-proofing compound containing hydrocarbon material or coated with such a compound or both saturated and coated therewith. Either the natural or the distilled product may be used. Asphaltum, tars, or pitches are named. It is added that:

"Many of the water-proof flexible materials now on the market may be utilized as foundations."

It seems to me that this is sufficiently definite and specific. I do not see how it could reasonably be made more definite. The person attempting to use the invention is presumed to be one reasonably skilled in the art, one acquainted with the art to a reasonable extent. The hydrocarbons are very numerous. It would occur to any one that the

hydrocarbon material used must be one the paper, felt, cloth, etc., would retain; one that would be and remain flexible; one that would be and remain water-proof and weather-proof; one that would not evaporate or go to pieces, etc. The carrier is either a substance or a mixture which is water-proof and weather-proof, more or less, and resistant to oxidation, and flexible, and transparent, translucent, or at least light-colored. Resins are mentioned, combined with oils and fats. Now the prior art was prolific of mention of such bodies, including stearin pitch, and it was only fair to presume that the person practicing the art according to the patent would possess a fair knowledge of the art, and use the resins, fats, oils, pitches, etc., which science and the prior art taught were suitable and proper for the purpose. Thus British patent to Taylor, No. 1,309 of 1876, describes a coating mixture of stearin pitch and linseed oil; and Palmer, No. 447,412 United States patent, has a covering for floors as a substitute for oilcloths, and says:

"The principal ingredients in my improved composition are the residuum from distilling candle material, which is commercially known as stearin pitch, or candle pitch, or stearin bitumen."

The Flynn British patent of 1890 has stearin pitch, pigment, and ground cork spread hot on jute or canvass.

It is true that the specifications do not attempt to enumerate those oils, fats, and resinous bodies that might be used, or those that should be used, or those that cannot be used; but I think such enumeration was unnecessary. In fact, it is quite probable that the inventors did not know all that might be used successfully, or all that were unsuitable. Enumeration of specific substances would have incurred the danger of excluding those not enumerated and of opening the door to all comers who should use materials of the same class not specified. Thus an error in enumeration, if attempted, might have defeated or destroyed the value of the patent to the real inventor. This great particularity the law does not demand. I have already indicated what it does require, and I think the patent is sufficiently specific in the matters mentioned. Clearly one reasonably skilled in the art would use pigments that will retain and disseminate their respective colors under the conditions of use described in the patent

The patent states that:

"The pigment employed in our invention, if incorporated with the carrier, must be of a character enabling it to withstand the temperature to which the carrier is heated at the time the pigment is added thereto, or the pigment may be applied subsequently to the carrier, which procedure enables us to employ pigments which cannot withstand the temperature of the molten carrier. We believe that mineral colors are best suited for the purposes of our invention."

As applicable to the composition of the facing the patent says:

"For the sake of simplicity we have referred to the second ingredient as a 'fatty body' in the appended claims; it being understood, though, that in our process this second ingredient may consist of either vegetable or animal oils or fats and liquid or solid waxes, whether vegetable, animal, or mineral, as well as products obtained from mineral oils and other products, such as sod oils or degras, fatty acids, etc. It will be understood that all these substances may be considered equivalents for the purposes of our invention."

The patent then proceeds to give an example of the process, and it follows that this shows the composition of the product, viz.:

"As an example of our process we would give the following: The sheet or roll of paper is saturated with pure soft asphalt heated to a temperature of about 100° Centigrade, and a mixture, which we will call 'Mixture A,' is prepared by heating together for about six hours at a temperature of 200° Centigrade four pounds of American linseed oil, one ounce of litharge, and one ounce of manganese borate. Then another mixture is prepared by heating together four pounds of kauri gum, three pounds of Burgundy pitch, and two and one-fourth pounds of Mixture A. While the temperature is about 130° Centigrade, add to the mixture four pounds of red iron oxide and roll the resulting mixture, when it has attained a temperature of 105° to 110° Centigrade, on the paper saturated with the asphalt; the rollers being heated with steam to a temperature of about 150° Centigrade."

In view of the prior art, I am of the opinion that patentable invention is shown. The art was, as is sometimes said, "crowded." It is evident, however, that there was room for improvement, and great improvement, in the way of producing weather-proof roofings and floorings of durable colors other than black or very dark.

In the prior art is found British patent to Kidd, No. 1,597, dated May 28, 1862. It relates to a composition, colored or not, for water-proofing fabrics and coating and protecting various articles, etc. It says:

"According to my invention codfish or linseed oil, or both, are boiled with oxide of lead, zinc, or other oxide, and such prepared oil is exposed for some time in thin films on extensive surfaces to the action of the air, and is thus further oxidized and converted into a substance of semiresinous nature. This substance is termed oxidized oil. I take oxidized oil, obtained in the manner described, or otherwise, and compound it with wax, mutton suet, and resins, and these three substances I term the base of my compositions. The proportions of each material forming the base, and the proportions of the base with the oxidized oil, may be modified to a considerable extent according to the purposes to which it is to be applied and the quality of the article desired. Coloring matters are also added to the compositions to produce the effect intended. For coating fabrics so as to water-proof them a suitable composition is obtained by combining about 40 parts of oxidized oil, 2 parts of wax, 6 parts of mutton suet, and 32 parts of resins, and coloring matter as required; but, as before stated, these proportions may be varied considerably and will have to be modified according to the result required. For increased elasticity more oxidized oil may be used, and to make the composition less liable to crack, more mutton suet or wax, or both mutton suet and wax, may be added, so that the best proportions will be readily obtained by trial mixtures. The composition is united and solved by heat, and it is applied in the hot liquid or plastic state to the surface of the fabric or articles to be coated or protected, or it is molded in that state into the required articles. It is not necessary for water-proofing fabrics or surfaces that any volatile solvent, such as naphtha, should be used in combination with the composition above described, though it may be employed, and particularly in some cases when used as a varnish."

It is evident that this is neither the process nor the product of the patent in suit. It is a sort of paint composition, and is applied hot to the fabric to be protected, paper, or cloth, etc. It may be applied with a brush, a mop, a hoe, or by running the fabric to be coated through the mixture and then between rollers. The fabric to be coated is not prepared or made weather-proof and there are other substantial differences.

In English patent to Norrie, No. 2,295, of May 31, 1876, we have an invention relating to:

"The use of asphalte or other bituminous matter in combination with cotton or linseed oil or other suitable oleaginous substances with textile or other fabric for the production of a fabric adapted as a covering for floors or roofs."

He combines oil with bitumen and applies it uniformly over the whole surface of the fabric by hand, or with the aid of spreading irons "whilst hot." Coloring matter may be added, and he also describes a crude apparatus for applying the mixture to the fabric. It is self-evident that this is not the combination of the patent in suit, either as to the process or the product. These and other patents of the prior art are suggestive and instructive. In applying the prior art practically the defects were made plain, and the inventors of the patent in suit state the difficulties to be met, the defects of the prior art, and claim to have a remedy. They do not assume to be pioneers, but improvers merely. They have a better product, a successful, durably colored (other than black), water-proof roofing. They have a better and a more successful process. All the constituent elements of a product, a new article of manufacture, may be old, as, of course, these were; but this product as a completed article of manufacture was new, and it was better than any that had gone before. The inventors did more than those ordinarily skilled in the art would do. There was mental conception, long experimentation, and a valuable and a new result. It was new in the sense and to the extent that there was a better union of the foundation with the facing, less or no confusion and intermingling of the color of the facing with that of the foundation, and it was a colored roofing, having permanent colors other than black, and there was the same degree of flexibility in the facing as in the foundation.

The main question is: Do the defendants infringe both patents? Clearly, to my mind, they infringe the second. Do they infringe the first? Stearin pitch is a body of itself. Assume it to be a resinous and a fatty body combined, that is, one having the properties of both, it is not artificially compounded as a step in the process by uniting a resinous body with a wax, a fat, or an oil. But the process claims themselves do not necessarily call for such a step. We are to apply to the foundation a facing "consisting" of a pigment and a carrier "containing" a resinous body and a fatty body. Stearin pitch partakes of the properties of resins, and is therefore a resinous body, and it contains oils or fats, and is therefore a fatty body; but it is not the result obtained from combining resins, or resinous bodies, with fats or oils, or fatty bodies, in practicing the process as disclosed in the specifications—that is, by fusing and mixing such two bodies together. The specifications plainly indicate that the process consists in mixing the resins or resinous bodies with fats or oils, so as to produce a facing containing both.

But it is conceded by Walker, defendants' witness, that defendants' Zolium, alleged to infringe, contains a mixture of stearin pitch, asphalt, and colored pigment. We have seen already that asphalt contains resin, and as a result we have in Zolium the foundation of the patent in suit, the facing and carrier of the patent in suit (compounded of

stearin pitch, asphalt, and pigment), and the same mode of uniting the two; that is, by applying and pressing the facing upon the foundation while hot, each being prepared separately, so that the applied surfaces interlock, the one with the other, forming the third part or portion intermediate the foundation and facing, and which intermediate portion is made up of the interlocking part of the foundation and the interlocking portion of the facing, so that, while the facing contains the resinous body, the fatty body, and the pigment intermixed, and the foundation contains the paper or burlap and the hydrocarbon material saturating it, this intermediate portion contains the resinous body, the fatty body, the pigment, the paper or burlap, and hydrocarbon all intermingled to an extent, all interwoven. I am unable to see that the presence of asphalt in Zolium, conceding its presence, avoids infringement. The addition merely would not avoid infringement in any case if the defendants use complainant's process or make their "new article of manufacture" differing only in the respect that asphalt is added. If asphalt is not used, we clearly have complainant's process and product, unless it be that in using stearin pitch the complainant's process of the first patent is avoided.

I have referred to the process of applying a paint facing while hot as old, but it must not be understood that the mode of applying the facing of the patent to the foundation of the patent, as therein described, was old in the art. It is one thing to apply a mixture in the form of a paint to a foundation while the paint is hot, and another thing to combine the mixtures, or some of them, in a facing such as is described, and then apply them, while both are heated to the proper degree, in such a way and by such pressure that they will interlock and then cool and harden to a degree, retaining their flexibility. The process pointed out in the patent, which varies from the prior art, was successful. The prior art was not. There is difficulty in pointing out why the one is successful when the other was not, and probably all the reasons are not known; but the discovery was patentable, and defendants infringe by using it.

Attention has been urged to the fact that stearin pitches were used in the art, in making roofings, etc., prior to the application for the patents in suit. It must be conceded, I think, that stearin pitches were used and may be used in making weather-proof roofings, that is, in forming the facing for the foundation, or both facings, if desired; but the patents, both of them, go to the idea of colored roofings (other than black), and to the selection and use of those oils and fats and resinous bodies which will produce a carrier for the pigment that is "transparent, translucent, or at least light-colored, so that its own color may be modified or entirely obliterated by the addition of pigment." When the pigment is added the flexibility must not be destroyed or impaired. It is evident from the first patent that all stearin pitches cannot be used; only those of the kind mentioned. Here is an important departure from the prior art. The prior art taught that pigments could be used, but that their use was unsuccessful, in that they would not show their true colors in the roofing. The prior art also taught that a facing containing pigment could, while hot, be laid, painted, or pasted

upon a foundation of the character described, and even pressed thereon; but it also taught there was not the requisite union, that the one would soon crack and peel off or disintegrate, as well as lose, or from the start fail to show the color of the intermixed pigment. I am also satisfied from the evidence that defendant made many efforts to produce the colored roofings shown in Zolium, but failed until it resorted to the process and ingredients shown in the claims and specifications of complainant's patents. I am therefore constrained to hold that both patents in suit (as to the claims in issue) are valid, and that defendants infringe.

There will be a decree accordingly, and for an injunction and an accounting.