## GUARANTY TRUST CO. OF NEW YORK et al. v. JOHNS–MANVILLE CORPORATION.

District Court, S. D. New York.

July 17, 1935.

E. Clarkson Seward, of New York City (W. Saxton Seward, of New York City, and Cushman, Darby & Cushman, of Washington, D. C., of counsel), for plaintiffs.

Dean, Fairbank, Hirsch & Foster, of New York City (Clair W. Fairbank and S. Augustus Demma, both of New York City, of counsel), for defendant.

KNOX, District Judge.

Plaintiffs are trustees under the will of James W. Dillon, deceased. As such they are the owners of United States letters patent No. 1,385,741, July 26, 1921, for a sound deadener for building structures, of which decedent was both inventor and patentee.

Upon March 22, 1922, Dillon made an agreement with an assignor of defendant, under which the latter, in consideration of specified royalty payments, has acquired an exclusive license to manufacture, have manufactured and sell the perforated textile fabric membrane shown and described in the patent. Dillon assumed and agreed to discharge full patent responsibility in respect to the materials covered by the license. In April of 1930, plaintiffs and defendant entered into a supplementary contract wherein defendant was accorded the right to issue sublicenses under the patent. This later document was not designed to lessen the force and effect of the agreement of March 22, 1922, but was "for the purpose of better facilitating the operation of Johns-Manville Corporation under said patent * * * with the intent of increasing the field of" its subject-matter and thereby increasing royalty returns.

Royalties paid to Dillon and the plaintiffs over the years that have elapsed since 1922, have exceeded $190,000. From this it will be seen that defendant has recognized the patent as one of merit, as is the fact.

As set forth in the patent specifications, the "invention relates to an improvement in a sound deadener for ceilings, walls and the like with the object in view of providing a structure which will break the sound waves (arising within a room) and absorb them * * * to provide a structure having a membrane perforated throughout its area, to break the sound waves and permit them to pass therethrough to be absorbed. * * * to provide a structure having a perforated membrane which may be coated and decorated without destroying its sound breaking qualities."

The means for effecting these purposes, as taught by the patentee, were that strips of wood should be attached to the ceilings and walls of a room to be deadened to sound. To such strips a sheet of unwoven material, such as felt, cotton, or other similar material possessing sound absorbing qualities, was to be fastened by cleats. To these a membrane of woven material having a series of perforations should be appropriately affixed, and in such wise as to provide a small chamber between the two classes of material. The unwoven material also was to be supplied with a series of holes or cells into which the sound waves, after being broken by the perforation in the woven membrane, will be retained or absorbed. Dillon disclosed several other forms of treating the woven and unwoven material so as to serve the ends he had in mind, but in each he referred to the sound deadening materials to be used as being either "woven" or "unwoven." The specifications, however, did contain this statement: "It is evident that various changes may be resorted to in the form, construction and arrangement of the several parts without departing from the spirit and scope of my invention; and hence I

do not intend to be limited to the details herein shown and described. * * *"

Upon the disclosure as set forth in the specifications, Dillon was awarded eight claims, three of which, Nos. 1, 3, and 6 are here in suit. These are:

"1. In a building structure, the combination of a wall or ceiling surface of a room, an exposed perforated fabric membrane, and means for supporting said membrane in spaced relation and adjacent to said surface, whereby sound within said room is deadened. * * *"

"3. * * * an exposed perforated fabric membrane, means for supporting said membrane in spaced relation and adjacent to said surface, whereby sound within said room is deadened, and a sheet of sound absorbing material located between said surface and said perforated membrane."

"6. * * * an exposed perforated fabric membrane, means for supporting said membrane in spaced relation and adjacent to said surface, whereby sound within said room is deadened, and a sheet of sound absorbing material located between said surface and said perforated membrane, said sheet of sound absorbing material being spaced from said perforated membrane."

Prior to about 1929 or 1930, the sound-deadening means manufactured and sold by defendant under its license, and as described by its counsel, consisted of three main types:

"(1) perforated oil cloth spaced in front of hair felt (Exhibit N) which, due to fire hazard, sagging, etc., was practically abandoned about ten years ago because the New York City Building Department will not permit its use,

"(2) perforated oil cloth cemented to a special type of hair felt invented by Mr. Nash of the Defendant company (Exhibits 5, 6, 7 and 8), and

"(3) to a very limited extent, muslin cemented to the hair felt and thereafter painted so that the paint closed the pores, holes being formed after the paint dried by punching with needles (dark brown portion of Exhibit A)."

Defendant credits its success under the Dillon patent to its use of oilcloth, containing perforations of smaller diameter than quarter-inch holes suggested by the patentee, which is cemented to the hair felt of Mr. Nash. These products described above are known to the trade under the name of "Kribble Kloth" and "Nashkote B."

In passing, it should be noted that Dillon, rather than defendant, is responsible for the adoption of perforated oil-cloth as a sound-breaking membrane. This material, being a textile fabric, is directly within the scope, and some of the claims, of Dillon's patent. It has, nevertheless, certain characteristics which differ substantially from those of porous materials formerly dominating the art. For example, it is washable with a sponge or damp cloth, without the necessity of removal from the walls or ceiling—its paint being ironed on, its dust-catching propensity is lessened—it can be decorated without interference with its merit, reliance for sound absorption being placed upon the perforations rather than upon the cloth itself. Dillon, it appears, was in communication with defendant in regard to the use of oilcloth some time prior to February 24, 1920. Upon that date, Lonsdale Green, Jr., an acoustical engineer of Johns-Manville Corporation, wrote Dillon as follows: "In regard to your perforated oil cloth for covering acoustical treatment; oil cloth itself is very impervious to sound and only transmits sounds of the lower pitches. We have tested oil cloths of different weights and find it very inefficient on account of its great weight and density. The percentage of sound absorbed by the felt behind the oil cloth will be represented by the percentage of open spaces in the cloth to the total area of cloth surface. On analysis we find that the holes are $\frac{1}{4}$" in diameter and are placed on $\frac{1}{2}$" centres both ways. Taking a typical area of 36 sq. in. you get 144 holes. As each of these holes contains .049 sq. in., the total amount of open spaces is 7.056 sq. in. in 36 sq. in. of the cloth. This analysis shows that 19.6 percent of the cloth only is open spaces. As the percentage of absorption is measured by the percentage of voids, in a case of this kind you can see that the covering is relatively very inefficient. Of course this same idea can be carried out much further by making the holes smaller in diameter and placing them closer together, carrying this out to its fullest extent in the porous cloth or wire screen idea. The porous cloth we have tried and are now using. The wire screen we have also tried but on account of its large percentage of voids it is a very

poor light reflector and cannot be considered for this work."

Nothing daunted by the discouraging tone of this letter, Dillon persisted in his oil cloth experimentation, and, in due time, defendant was glad to follow his teaching in regard thereto.

In June of 1927, C. F. Burgess Laboratories, Inc., installed a sound-deadening apparatus in Chicago. It thereafter became the subject-matter of Norris patent No. 1,726,500, August 28, 1929, and came to be known as "Sanacoustic Tile." Rock wool was used for sound absorption. This was supported by a perforated stiffly rigid metal sheet equipped with flanges to engage T bars. The use of sheet metal facing as an outer surface was productive of a number of advantages not possessed by any textile membrane. Among them are the following:

(a) Sheet metal is substantially fireproof and cloth is not;

(b) Sheet metal is superior to cloth as a supporting medium for mineral wool;

(c) It may readily be conformed to curved surfaces;

(d) It has a permanence of useful life unpossessed by cloth and is less open to physical deterioration and injury;

(e) Metal is capable of heat process enameling and may, if painted, be scraped and redecorated while cloth can not thusly be treated;

(f) Metal can be prepared at a factory but cloth must skillfully be cut to conformation on the job;

(g) Metal may also be perforated for decorative and utilitarian purposes as desired without substantially weakening the structure, whereas the cutting of too many threads of a textile membrane may seriously reduce its power of resistance.

Although the sound absorption efficiency of Burgess Sanacoustic Tile and defendants Kribble Kloth and Nashkote B were about the same, the latter products, over the period reaching from June, 1927, to March, 1929, came to feel the pressure of keen competition. Within that period, Sanacoustic Tile was selected for ninety installations. In twenty-six of them the business was taken away from defendant. Efforts were made to stiffen, or otherwise treat the oil cloth membrane of defendant so as to equip it with some of the virtues of the rival construction. They were unsuccessful. Notwithstanding that the present litigants stood to suffer from the activities of the Burgess Laboratories installations, neither of them asserted or claimed an infringement of the Dillon patent. Defendant finally recognized its inability satisfactorily to bid for business against the steel-faced construction and proceeded to buy its peace by acquiring a license under the Norris patent. In order to obtain the same, defendant was required to guarantee Burgess Laboratories an annual royalty much in excess of the sum which, in any year, with but two exceptions, had accrued under the Dillon license.

Under the arrangements made with C. F. Burgess Laboratories, Inc., defendant is not required to pay it a royalty on Sanacoustic Tile if it be held liable to the holder of the Dillon patent for an infringement thereof. Plaintiffs' counsel attaches importance to this provision of the contract and cites it and defendant's general course of conduct as evidence that defendant deliberately became a traitor to the Dillon patent. This contention seems unfounded. Defendant not only advertised its acquisition of the right to exploit Sanacoustic Tile, but actually tendered that material to Guaranty Trust Company for the sound deadening of one of its offices. Furthermore, it seems nothing more than good business judgment that defendant should have protected itself from a double payment of royalties on Sanacoustic Tile if it came about that it was judicially determined to be within the scope of Dillon's patent. As bearing upon defendant's good faith, mention should be made that Kribble Kloth and Nashkote B continue to be advertised, and their advantages proclaimed. Furthermore, they continue to be sold, and since the Burgess agreement went into effect in 1929, the royalties paid to plaintiffs have been little short of the sums that accrued in the previous seven and one-half years.

At the same time, no denial can be made that Johns-Manville Corporation, since acquiring the right to market Sanacoustic Tile, has done so. It also is manufacturing and selling a product called "Transite." In such construction the sound-absorbing material is faced with a perforated slab or plate of cement. By way of supplementing its line of acoustical supplies, defendant expects shortly to use a sound deadener made of corrugated asbestos paper, the outward surface layer

to be impressed so as to present a basket weave appearance, and to be perforated by narrow laterally facing slits. When marketed, this structure will bear the name "Basket Weave."

While, as stated above, Kribble Kloth and Nashkote B continue to be sold, it is not unlikely that their popularity is upon the wane, and hereafter, royalties for their use will fall away. In the face of this probability, plaintiffs are naturally dissatisfied. In order to re-establish their former favorable position, they have brought this suit, and seek a decree which will yield them revenue from defendant's installations of Sanacoustic Tile, Transite and Basket Weave. If they be accorded relief, they offer to license defendant to make and use these wares upon the royalty basis set forth in the Dillon license agreements.

As readily will be seen from the foregoing recitals, the question basically presented for decision is whether the word "fabric" as used in Dillon claims 1, 3 and 6 properly may include sound-breaking membranes constructed of sheet metal, cement, or asbestos, or be limited to those which are, or partake of, the nature of textile fabrics. This, of course, is a matter of interpretation of the claims in the light of Dillon's specifications and their contemporary art.

So far as acoustical function and result are concerned, concession is required that the alleged infringing structures are the substantial equivalents of Kribble Kloth and Nashkote B. If it be, however, that a limitation is fairly to be imposed upon the meaning of the word "fabric" as used in claims sued upon, the element of equivalency in function and result is of little moment. Kaumagraph Company v. Superior Trade Mark Manufacturing Company (C.C.A.) 72 F.(2d) 417.

As bearing upon the quality of the membrane within Dillon's contemplation, recollection must be had that throughout his specifications he referred to it as a woven material. Thus, on their face, he never seems to have conceived the idea that a sheet of steel, which in and of itself is a reflector of sound waves, was capable upon perforation of serving as an agent of their disruption. This leads to a consideration of the state of the sound-deadening art at the time Dillon became a contributor to its development.

Sound absorption within auditoriums and other rooms has engaged the attention of acoustical engineers for a good many years. As far back as 1900 Dr. Wallace Clement Sabine, Professor of Physics at Harvard University, published the result of his investigations in the American Architect. He there pointed out that acoustical difficulties in auditoriums might be corrected by the use of fabrics, such as felt, uncovered or covered denim, burlap or the like, all of which are porous. He went on to say that the ordinary structural wall and ceiling, such as brick, tile, wood sheathing, plaster on wood, or wire lath and plaster applied directly to solid support, are practically impervious to sound waves, and the diminution of incident sound is almost wholly due to the flexibility of such structures, and such flexibility is so slight that for the purpose of correcting acoustical difficulties they are practically nonabsorbent. In his opinion such structures reflected at least 90 per cent. of the incident sound, and in the great majority of cases more than 95 per cent., the loss of the remaining sound being wholly due to the yielding of the structures or actual transmission. It was his view that if the difficulties of sound reflection were to be overcome successfully, the halls of an auditorium should be made more highly absorbent for sounds having a pitch in the three octaves above middle C. Hence, it was Sabine's proposal that auditoriums should be equipped with a ceramic material having a body of exposed finished face and provided throughout with intercommunicating pores which openly penetrate its finished face. By this means, sound would pass through the wall for absorption within a porous spongelike material. On December 1, 1914, Sabine & Guastarino procured the issuance of patent No. 1,119,543, covering their joint invention, along the lines just described. The progress of the art is illustrated in Sabine patent No. 1,205,938, Webb Nos. 1,153,836 and 1,193,092, U. S. Mazer patent No. 1,172,379 and British Mazer patent No. 4914.

The inventor of the patent in suit was a painter and interior decorator. He seems also to have been highly intelligent and ingenious. Being often employed by defendant in its installations of sound absorption apparatus, he became familiar with the state of the art which, in his time, was confined to the use of textile

fabrics of considerable porosity. Such materials, for æsthetic reasons, needed to be decorated. Painting them would bring about a closure of the material's pores, with a consequent loss of sound absorption. He, therefore, conceived the thought that if holes of sufficient size deliberately should be made in a particular sound absorbent textile material, the waves would be broken and penetrate such holes for eventual absorption within a layer of felt or other similar material. Prior to his experimentation with oilcloth, he seems never to have taught that a perforated nonporous material, such as sheet metal, was capable of advantageous utilization as a sound-breaking membrane.

A comparison of the patent in suit with that of Mazer, United States letters patent No. 1,172,379 and the Mazer British patent No. 4914, indicates that their chief points of difference, so far as revelation is concerned, is that Dillon provided that his outer membrane should be a porous cloth containing definite perforations, while Mazer made no provision for perforations other than those which were characteristically inherent in the weave of the membrane cloth. Then, too, Mazer in his United States patent No. 1483368, the application for which antedated that of Dillon by twenty months, revealed that sound absorption could be secured by means of an apertured structure through which sound waves would pass to felt or other like substance in its rear. He likewise declared: "It will be understood that the principles of my invention may be carried out by forming the sound-absorbing apertures not only in blocks, sheets or other structural elements, but also in the surface of an already erected wall or ceiling."

■ Although there is no wish upon my part to detract from the merit of Dillon's patent—the success by which it has been attended shows its usefulness—I must decline to classify it as a pioneer in the art to which it pertains. Falling short of this, the claims should not, through a process of interpretation of Dillon's phraseology, be permitted to stifle further advances in the art, and to bring about a denial of suitable rewards to subsequent inventors who, themselves, have contributed to a highly desirable end. Such thought would seem to be that which led to the decision in Brown et al. v. Stilwell & Bierce Manufacturing Company (C.C.A.) 57 F. 731; Deitel v. Unique Specialty Corporation (C.C.A.) 54 F.(2d) 359; Chicago & N. W. R. Co. v. Sayles, 97 U.S. 554, 24 L.Ed. 1053; McCormick v. Talcott, 20 How.(61 U.S.) 402, 15 L.Ed. 930. See, also, White v. Dunbar, 119 U.S. 47, 7 S.Ct. 72, 30 L.Ed. 303.

■ But, say plaintiffs, if "fabric" be not accorded its literal and primary meaning as including a "structure of anything," what distinction is to be made between claims 1, 3, and 6 and claim 4 which calls for a "perforated textile membrane." Assuming that an answer to this inquiry is required, I should say that Dillon, as well the Patent Office, probably had in mind the fact that as of the date of the patent application and its issuance, certain fabrics, not essentially textile in character, had the ability to serve as a primary sound absorption medium. Billiard cloth, for example, is felted and not woven. Other fabrics composed either of animal or vegetable fibers might be mentioned.

In addition to this, the definition of membrane would seem to eliminate the possibility that in so describing his sound-breaking medium Dillon intended to include a substance such as sheet metal. Funk & Wagnalls defines membrane in these words: "A thin sheetlike structure, usually fibrous, connecting other structures or serving to cover or line some part or organ * * * 3 a piece of parchment or vellum." Then, too, the primary meaning which the same authority gives to the word fabric is this: "A woven, felted, or knitted material for wear or ornament, as cloth, felt, hosiery or lace; also the material used in its making (2) Something that has been fabricated, constructed or put together; any complex construction; a system built up of correlated parts; structure, edifice, as a social fabric."

A textile fabric responds in all respects to such primary meaning, but sheet metal does not. That "fabric," when used in acoustics, was a term of art and not inclusive of metal, is indicated by its use, at the hands of Dr. Paul Sabine who, in his work, "Acoustics and Architecture" refers to "light materials of paper, fabric, aluminum and fibre board." In testifying for plaintiff upon the trial, Dr. Sabine frankly said that in his writings the word "fabric," as frequently used by him, was exclusive of sheet metal. For instance, on page 143 of the book, he states: "In the earliest application of the method hair

felt was extensively used. This was surfaced with fabric of various sorts sketched on furring over felt. Painting of the fabric in the usual way was found materially to lessen the absorbing efficiency. The development of better grades of felt mixed with asbestos, the glueing of a perforated washable membrane directly to the felt, and finally the substitution of perforated metal plates for the fabric marked the evolution of this form of absorbent treatment." In giving his testimony, Dr. Sabine, in answer to a question, said that, up until his retention as a witness, he had never heard the sheet metal of Sanacoustic Tile referred to as a fabric.

Concluding my discussion, it is to be remarked that "fabric" found its way into the claims in suit as a result of an agreement between the Examiner and Dillon's patent solicitor, in order to distinguish the claims from certain prior art, and it seems reasonably safe to believe that in so inserting the word, neither of them had the faintest intention that, as used, it was to include either the sheet metal of Sanacoustic Tile or the cement slab of Transite. Instead of being given its broadest meaning, fabric, as used in the claims in suit must be limited to the materials which the parties had in mind when the descriptive term was selected.

■ As a result of the foregoing considerations, I shall not hold Sanacoustic Tile to be an infringement of the claim in suit. The same conclusion is reached as to Transite. The cement slab of this construction contains a quantity of asbestos fiber, it is true, and for this reason may be said to be of the nature of a textile. Nevertheless, its cementitious content is such as to overcome most of its textile fabric quality, and to enable it, in some respects at least, to approach the properties inherent in Sanacoustic Tile. Furthermore, the outer surface facing of Transite is so thick as not only to take it from without a membranous classification, but to give it entirely different characteristics.

The Basket Weave material, on the other hand, is in derogation of plaintiffs' patent rights, and a decree against its further manufacture and sale may issue.

■ One more word should be added. Counsel for plaintiffs with much earnestness has argued that the decision I have reached as to Sanacoustic Tile and Transite is not justified in the face of the holding of the Circuit Court of Appeals for the Tenth Circuit in Johns-Manville Corporation v. National Tank Seal Co., 49 F.(2d) 142, and wherein the word "fabric," as used in the patent there before the court, was held to be infringed by a flexible sheet of metal used to perform the same function. All that I care to comment is that, in the patent law, equivalents are a variable quantity, and that an article held to be such in one art may be something quite different when it has to do with another field of endeavor. I think, therefore, that under the facts of the case before me, the decision in the National Tank Seal litigation should not control my findings.